Masourides v. State.

---

JOHN MASOURIDES V. STATE OF NEBRASKA.

FILED FEBRUARY 26, 1910.    No. 16,425.

1. Criminal Law: WITNESSES: REFRESHING RECOLLECTION. A party who calls a witness, and is in part taken by surprise by his unexpected and unfavorable testimony, may, for the purpose of refreshing his recollection, interrogate him as to a written statement previously made by him which is inconsistent with part of his testimony, and thereby seek the correction thereof, and may, for that purpose, submit the statement to the witness for inspection. The denial of the witness of the correctness of a part of such statement will not render the whole of the writing admissible in evidence.

2. ———: EVIDENCE: ADMISSIBILITY. Where a statement of substantially all of the facts of the killing of a human being, and for which a party is on trial for murder, is prepared by the county attorney and signed by a witness of the tragedy, and upon the trial the testimony of the witness contradicts a part of such statement and denies its correctness, it is reversible error to permit the whole of such statement to be read to the jury.

3. ——: Witnesses: Impeachment. Ordinarily a party may not impeach his own witness by showing that he has made statements previous to the trial contradictory of his testimony. This, however, will not prevent proof of the truth by other evidence or witnesses.

Error to the district court for Douglas county: Abraham L. Sutton, Judge. Reversed.

Sullivan & Rait and J. M. Macfarland, for plaintiff in error.

W. T. Thompson, Attorney General, and George W. Ayres, contra.

Reese, C. J.

An information was filed in the district court charging plaintiff in error with the crime of murder in the first degree in the killing of Edward Lowry, a police officer of the city of South Omaha, on the 19th day of February, 1909. A trial was had, beginning on the 24th day of May of the same year, which resulted in a verdict finding the accused guilty of murder in the first degree, and fixing the penalty at death. A motion for a new trial was filed and overruled, and sentence of death was pronounced against him. He brings the case to this court by proceedings in error. A number of alleged errors are presented, but, as another trial must be had in which the same causes for complaint will probably not arise, they, with the exception of the one error hereinafter discussed, will not be noticed. It was contended upon the trial, and is here insisted upon, that the evidence submitted to the jury is not sufficient to sustain the verdict, but it is not deemed necessary, or even proper, that we express any opinion upon that subject.

As leading up to the question to be considered, certain conceded facts may, with propriety, be stated. Plaintiff in error is of foreign birth and nationality, having at the time of the tragedy been in this country but about two

years, and was wholly unacquainted with the English language, not being able to either speak or understand any part of the speech of this country. A countryman and friend of his had what is spoken of as a candy kitchen in South Omaha, which was frequently visited by plaintiff in error. The wife of his friend was not of his nationality and could not speak his language. He expressed a desire to learn to speak English, and sought the aid of some one who could teach him. He was referred to a girl, or young lady, by the name of Lillian Breese, of the age of about 17 years, who was working in the candy kitchen, and through the aid of an interpreter it was arranged that she, for a compensation named, should give him, and perhaps others, lessons in the language. Miss Breese, whose reputation appears to have been good, was living in a room in one of the nearby flats with her little brother of between six and seven years of age, and it was arranged that the lessons should be given at her room. At the time to which we refer she had given him two lessons. On the evening of the 19th day of February, 1909, after the completion of her labors at the candy kitchen, she with her little brother were starting for her room when plaintiff proposed accompanying her, which he did, and the three went to her home. Soon after their arrival the deceased called at the house, and inquired of the landlady if the girl and little boy were in their room. On being informed that they were, he expressed a desire to enter, and was shown to the room. The landlady knocked on the door and Miss Breese opened it. The deceased entered at once, and directed Miss Breese and plaintiff in error to accompany him to the police station. They started with him, leaving the little boy with the landlady. On the way to the station the tragedy occurred, by which the officer was shot and killed, and plaintiff in error received two gunshot wounds, one in the breast, and the other in the leg. Miss Breese, becoming frightened, stepped into a nearby hallway as soon as the first shots were fired. There is no suggestion of any element of guilt or wrong doing on the

part of Miss Breese or of the plaintiff in error up to the time of the invasion of her room by the officer, nor on her part at any time in connection with the tragedy. It does not appear whether she was ever permitted to return to the little brother or her room, or not, but it is shown that during the whole of the time from that night until the day of the trial she was kept in confinement in the jail. Just why this was made necessary, or even rightful, is not made clear. She was examined as a witness before the coroner's jury, and, probably, at the preliminary examination. On the next day after the tragedy, and without the presence or knowledge of plaintiff in error or any one in his behalf, the county attorney visited her and procured from her a statement of the principal facts of the tragedy. This statement was written by the county attorney and read over to her, and to which she signed her name. It does not appear that the written statement was ever made public or that any others knew of its existence. It corresponded substantially with her testimony given at the trial. In the statement, in describing the affair, occurs the following: "I then heard some one, I think it was the Greek, say 'stop', and then I heard one or two shots. After I heard these two shots I saw the officer take his gun from his clothes, I thought from his pocket, and then I ran into a hallway a few feet away." In her testimony upon the trial she said that after she heard the two shots she "noticed the officer take his hand from his side, and then I ran." The following is a part of what follows in the bill of exceptions: "Q. Take his hand from his side, where? A. Well, his hand from his side. Q. From his pocket? A. Yes, sir; like taking his hand from his pocket. Q. Yes; and when he took his hand from his pocket, what, if anything, did you see in his hand? A. I didn't see nothing. Q. Didn't you see a gun. A. No, sir. Q. In the officer's hand? A. No, sir. Q. You testified at the coroner's inquest about this shooting, didn't you, just a few days—(interrupted)? A. Yes, sir. Q. Didn't you state at the coroner's inquest, when

the officer took his hand from his pocket you then, for the first time, saw his gun?" This was objected to as "incompetent, irrelevant and immaterial; no foundation laid, and an attempt to impeach his own witness." Whereupon the county attorney made the following statement in the presence of the jury: "If your honor please, we are entitled to this question from this witness. Your honor can realize the situation the state is in with this witness who is, in the nature of things, a hostile witness to the state. Now, then, if the state can develop the fact that, since the testimony of this witness taken immediately after the occurrence, there has been marked departure from that testimony and her testimony here on the stand, why, we ought to be entitled to show that. It wouldn't be fair, in other words, for the state to be betrayed into putting a witness on the stand, and have her change her testimony afterwards." Defendant's counsel responded as follows: "The defendant wants the record to show his objection to the question and also his exception to the statements of the county attorney made in the presence of the jury, in reference to what it appears since the former examination, since the preliminary examination or the examination at the coroner's inquest." The court: "The objection is overruled", to which exception was taken. "A. No, sir; I did not." Her attention was then called to the written statement which she made, written by the county attorney, which she testified she signed, that it was read to her, and was correct, and was asked: "Q. And is that the statement, Miss Lillie (counsel handing witness a paper)? A. Yes, sir. I never said that the officer took his gun, I said he took his hand from his pocket like he was taking his gun from his pocket. I didn't say he took his gun from his pocket, I said like he was taking his gun. Q. Like he was taking his gun? A. Like he was taking his gun. Q. What do you mean by this in the statement, 'After I heard these two shots I saw the officer take his gun from his clothes, I thought from his pocket, and then I ran into a little hallway a few feet

away'?" Plaintiff in error's counsel: "The defendant ob-
jects to this as incompetent, immaterial, hearsay, and
irrelevant; an attempt to impeach his own witness with
reference to an instrument that is not admissible in evi-
dence or binding this defendant in any way." The ob-
jection was overruled, and exception taken. "A. I never
made that statement. Q. Do you want to change that
statement now? A. Why, I will say just like I said be-
fore. Q. What do you say now? A. I said that I seen the
officer take his hand from his side like he was taking his
gun from his pocket. Q. What do you say as to whether
you saw a gun or not? A. I never seen no gun."

On the re-examination of the witness by the county at-
torney the following is shown to have occurred: "Q. Call-
ing your attention to the statement you have identified
as having been made by you immediately following this
shooting, to the language, 'Just before I heard the first
two shots I was not far from the Greek, and immediately
before these shots were fired I saw him (referring to the
Greek) turn toward the north and partially face the offi-
cer. It was after that, and when the officer came up
closer, I saw the officer take out his gun.' How do you
explain that language in the statement?" Plaintiff in
error's counsel: "Objected to as incompetent, irrelevant
and immaterial; no foundation laid, and not the best evi-
dence; an attempt to impeach his own witness, and hear-
say." County attorney: "I offer as part of the examina-
tion of this witness the statement that has been identified,
and I pursue this examination upon what is apparent
from the examination of this witness, that she is hostile
to the state, and has come upon the stand here as a
state's witness, and, according to our theory, has given
testimony in variance with her statements to the county
officials and statements made at the coroner's inquest."
Plaintiff in error's counsel: "The defendant objects to the
question as incompetent, immaterial, irrelevant; no foun-
dation laid; not the best evidence; an attempt to impeach
his own witness, and cross-examination of his own wit-

ness." The objection was overruled, to which ruling of the court defendant excepted. Plaintiff in error's counsel: "The defendant objects to the statement of the county attorney, in the presence of the jury, at this time, as incompetent, immaterial, irrelevant; no foundation laid; not the best evidence; an attempt to impeach his own witness, and cross-examination of his own witness." The objection was overruled. Defendant excepted to the ruling of the court.

. While other portions of the examination of this witness show similar proceedings by the court and counsel, it is not deemed necessary to make further quotations in order to present the question involved. The whole of the written statement was offered in evidence by the state, and over the objections and exceptions of plaintiff in error's counsel was read to the jury. This, we think, was clearly wrong and highly prejudicial to plaintiff in error. It is to be observed that upon a careful reading of the testimony of the witness we are persuaded that she was not hostile to the state, but that her examination exhibited a candid and honest desire to tell the truth as she understood it. The statement in the writing, if incorrect, would naturally fail to attract the attention of one not familiar with detailed expressions and writings, and might be passed unnoticed, and the correction upon the witness stand would leave no just ground for the aspersions cast upon her in the presence of the jury. As we have seen, she had been incarcerated in the jail during the whole time from the date of the tragedy until called upon the witness stand. Enough appears to show that she had been under close surveillance during the whole time. Over the objection of the county attorney, she was, after the second effort of plaintiff in error's counsel, permitted to state that she had never conversed with them, and, in fact, had never seen either one of them until called upon as a witness upon the trial. She had never before been called upon to pass through such an experience; had never been in court as a witness; was to some extent, at least, unfamiliar

with the forms of expression in legal papers, or, perhaps, not quick to detect slight errors in details of statement in such documents. The written instrument which she signed consisted of three and a half of legal-cap pages. She was then in the jail, the next day after the tragedy, which occurred at about 11 o'clock of the night before, and one may well imagine the state of her mind, although practically unacquainted with either of the parties to the unfortunate affair. It is evident from the whole record before us that the effect of the introduction of the written statement in evidence could not be otherwise than to impeach, or at least impair, the testimony of the witness in the estimation of the jury, or give the statement the force and effect of substantive evidence, neither of which should have been permitted. It is elementary that, if a party is surprised by the statements of his own witness upon the stand, he is not bound by such statement, but may show the fact to have been otherwise than as stated, by other competent testimony; not so much for the purpose of contradicting, and to that extent impeaching, his own witness, but to show the truth. *Blackwell v. Wright*, 27 Neb. 269; *Nathan v. Sands*, 52 Neb. 660. By the examination of the witness, the detailed statement by her as to the signing of the paper, its presentation to and inspection by her, the reading of the portion in dispute to her in the presence and hearing of the jury, when all considered, presented the *discrepancy* as fully and completely as it was or could have been possible to do. All that the county attorney sought to do, and all he had the right to do in the way of showing such discrepancy in the statements had been accomplished, and the introduction of the statement itself could add nothing to the proof of the fact. It did not and could not show which of the two was correct. The jury were fully advised of her testimony before them and of the statement upon that point in the writing. The state could, in reason or law, ask nothing more. There can be no doubt but that it was competent to refresh the memory of the witness by calling

her attention to the written statement, assuming the variance to be of such materiality as to justify it, and thus attract her attention to the specific facts and by that means obtain her best recollection, and it could properly be read to her for that purpose, but to allow the whole instrument to be read to the jury and commented upon, as was allowable if admitted, could have no other effect than that of substantive evidence, hearsay though it might be, and thus destroy a constitutional right of the accused on trial. In *Hickory v. United States,* 151 U. S. 303, it was held that "proof of the contradictory statements of one's own witness, voluntarily called and not a party, inasmuch as it would not amount to substantive evidence and could have no effect but to impair the credit of the witness, was generally not admissible at common law." This question was before the supreme court of Ohio in *Hurley v. State,* 46 Ohio St. 320, and in an exhaustive opinion by Judge Williams many cases are cited in support of the rule that, where one is surprised by the testimony of his own witness, he is not bound by it, but may show the truth by other witnesses, proving the facts by them, but not by proving the former statements of the witness contradictory of his testimony. That opinion is reproduced in 4 L. R. A. 161, and is annotated by the editor, and to which we refer without further citation. A moment's reflection must show the fallacy of the contention of the state and ruling of the court upon this question. The necessary effect of the course pursued must have been either to discredit and, to that extent, destroy the credibility of the state's own witness, or to substitute for her evidence the former statement alleged to have been made by her. The secondary effect was to get before the jury her evidence upon the witness stand, and the whole of the written statement covering substantially the same facts, and thus bolster up and support her testimony by introducing her former statement in support thereof. All of which is in conflict with the plainest and most fundamental rules of evidence.

It is the contention of plaintiff in error that he was intending to depart from the city of South Omaha for Kansas City within a short time after the hour when he was arrested; that he was uncertain as to his return, and was taking his property, including the pistol and knife, with him, having them upon his person for that purpose; that he could not understand the English language, but had been informed that the carrying of concealed weapons was a violation of law; that his efforts to reach his pocket were prompted by a purpose to throw the pistol into a secluded place near the edge of the sidewalk where he could afterwards procure it; that he had no intent or purpose of assaulting or taking the life of the officer; and that he did not shoot until after receiving the wounds from the two shots fired by the officer, and which wounds were serious and from which he had not recovered at the time of the trial.

The judgment of the district court is reversed and the cause is remanded for further proceedings in accordance with law.

REVERSED.