FRANK ERDMAN v. STATE OF NEBRASKA.

FILED JANUARY 24, 1912. No. 17,291.

1. **Criminal Law: ATTEMPTED HOMICIDE: PRESERVATION OF EVIDENCE.** In a criminal prosecution, based upon the explosive quality of a substance, which it was alleged was placed upon a porch of an occupied dwelling house for the purpose of committing a murder, the utmost care should be taken in preserving the substance and its identity, in order that no mistake be made, and all uncertainty removed.

2. ————: **EVIDENCE.** The paper wrapped around the substance charged to have been dynamite bore the brand of a well-known manufacturer of dynamite. It was shown that at the stone quarries, near the city of Louisville, the same brand of dynamite was used, and that the depository in which it was kept was not secured by lock and key. The accused was seen in Louisville a few days before the perpetration of the alleged crime, but it was not shown that he knew where the dynamite was deposited, nor that he was seen near there, nor that any of the dynamite there stored had been taken away. *Held* too remote and of no probative force.

3. ————: ————: **PREJUDICIAL ERROR.** A trunk dealer was called as a witness, who was permitted to testify that, prior to the day on which the alleged crime was committed, he had two suit cases in stock similar to the one offered in evidence as the one placed upon the porch of the dwelling house, and some time thereafter there was but one; the other not having been sold, so far as he knew. There was no proof that plaintiff in error had been to the store, nor that he knew of the existence of the two suit cases, nor that the supposed missing one had been sold or stolen. The objection by the defendant to this testimony should have been sustained. The evidence was immaterial and irrelevant and prejudicial to the accused.

4. ——: WITNESSES: EXAMINATION: PREJUDICIAL ERROR. The state called a witness in rebuttal. She had previously made a written statement to detectives representing the state as to the time of day when a certain picture was taken, but which she stated upon the witness-stand she had, upon reflection, concluded was erroneous. Thereupon the county attorney proceeded to read to her, in the presence of the jury, her statement taken by the detectives. *Held*, under the circumstances set out in the opinion, erroneous.

5. ——: ——: REFRESHING MEMORY. A witness who was called by the defense stated that at the time of the commission of the alleged offense he was a reporter for a local newspaper, was present when the contents of the suit case were examined by the police, and made certain notes of the condition of said contents. His testimony was asked upon a material question, when he responded that the facts had been correctly reported and the report published in the paper as furnished; that after the publication of his report he examined the article in the paper and found it correct; that the original notes were thrown aside or destroyed, but the facts as to the condition of the contents of the suit case had left his mind. He was asked to refresh his memory by a reference to the published report. Objection by the state was sustained, the court holding that he could refresh his memory only by reference to his original notes. *Held* error.

ERROR to the district court for Douglas county: LEE S. ESTELLE, JUDGE. *Reversed.*

*John O. Yeiser* and *Charles E. Foster,* for plaintiff in error.

*Grant G. Martin, Attorney General,* and *Frank E. Edgerton, contra.*

REESE, C. J.

An information consisting of three counts was filed in the district court by the county attorney of Douglas county, the first count of which charges plaintiff in error with having made an assault upon Thomas Dennison on the 22d day of May, 1910, with intent to murder the said Dennison. No further specification of the manner of the assault is contained in the count. The second count is for the same offense, but contains the averment that the as-

sault was made by placing a suit case, containing dynamite and a loaded revolver, upon the porch of Dennison's residence, the contents of the suit case being so arranged that, when lifted, the revolver would be discharged causing the dynamite to explode. The third count is similar to the second, except that the condition and contrivance of the suit case and its contents are stated with more elaboration, and which need not be here stated. A jury trial was had, which resulted in a verdict finding accused "guilty as charged in the information of the crime of assault with intent to murder." A motion for a new trial was filed, which being overruled, a motion in arrest of judgment was filed, which was also overruled, when plaintiff in error was sentenced to confinement in the penitentiary for the term of 15 years. He brings error to this court.

Testimony was introduced to the effect that on Sunday, May 22, 1910, at about 10 minutes before 3 o'clock in the afternoon, a suit case was discovered standing on the porch of Thomas Dennison; that a screw-eye had been screwed into the porch floor, and a string or cord projecting through a hole in the bottom of the suit case was tied to the screw-eye. It is shown that a few minutes before the suit case was discovered parties were on the porch and no suit case was there. During the time, up to the discovery, persons were in the house, but they knew nothing of the suit case being placed there. A dog was in the house, and the witness who was within heard the dog growl or make some alarm, and she soon afterward went to the door and the suit case was seen. The suit case was picked up by one and dropped to the floor, kicked over by another, picked up again by another and dropped down, and finally was left lying on its side on the porch floor after having been opened, when the parties all went away so leaving it. Later in the afternoon, perhaps about 6 or 7 o'clock, upon the return home of Mr. Dennison, who had been absent during the afternoon, certain policemen were called, who untied the string

from the screw-eye, and carried the suit case a short distance from the house and opened it, when certain sticks of substance, said to be dynamite, were discovered, and with them a pistol, said to have been loaded with powder and dynamite, which was so placed that by pulling the string the hammer would be raised as if to discharge the pistol, the force of the discharge reaching the dynamite, and thus producing an explosion. The sticks were removed from the suit case, placed in a bucket, and the whole, with the suit case, carried to the police station, where it was placed in a room in the upper story of the barn used in connection with the police station for the purpose of storing stolen property and such like. Later, during the succeeding week, all the sticks, about 25 in number, were removed to the foundation of a building in the city of Omaha, which was being wrecked, and were exploded in tearing down the foundation of the old building.

Assuming, as we do for the purposes of this opinion, that the contents of the said suit case was taken to the police station, it is unfortunate that some of the sticks were not at once placed in the hands of a competent chemist for analysis. It is insisted that the evidence is not sufficient to show that the sticks were so carefully kept as to render it certain that those used in wrecking the wall referred to were the identical sticks taken from the suit case. It is apparent that the strictest care should have been taken in that regard. It is also unfortunate that the police officers allowed all to be removed from their charge and care and be destroyed in blasting the wall, if they were so destroyed. Some portion at least of the "sticks" should have been carefully preserved in safe hands and presented upon the trial, in order that the fullest and most careful examination might be then made. This was not done, and an element of uncertainty, under the evidence, was presented that might have been avoided. Certain officers and others who saw the sticks testified that they were dynamite, largely basing their judgment

on the appearance of the "sticks" and their contents. Some of them testified to having used that substance, but their own testimony showed that they could easily have been mistaken, for a substance was presented to them while on the witness-stand in cross-examination which upon inspection they declared was not dynamite, but which a competent chemist analyzed and found to be that substance. Thus was the probative force of their testimony somewhat at least impaired.

As we have seen, the suit case must have been placed on Mr. Dennison's porch by some one, probably at from 2:30 to 2:45 in the afternoon, while persons were in the house and on the same level of floor. Plaintiff in error is charged with so placing it. The question of his identity becomes a most important one. He is said to have been seen in the neighborhood of Mr. Dennison's home the day and night of the day before (Saturday) and on Friday, two days before. It is shown that he was in the employ of an organization, known as the "Civic Federation," as a detective, and that his duties were to discover and unearth violations of the law in Omaha and elsewhere, and the mere fact of his presence in that part of the city, if he were present, might not raise any presumption that he was there for an unlawful purpose. It is also insisted that he was seen at and near the home of Mr. Dennison about the time the suit case was left on the porch, and one witness testified to having seen him on the porch, but saw no suit case, and did not see his face, except a side view. This witness also testified to having seen some one standing in the street in that neighborhood at about the hour of 12 o'clock, midnight, a night or two before the Sunday in question. His testimony is that he slept in an upper room, and, at the hour named, had occasion to arise to answer a call of nature, when he opened a front window of his room and from which he relieved himself. It was shown that there was a bath-room and water-closet nearly opposite his bed-room, across a hall of about three feet in width, the door of which was not more than seven or eight feet from the head of his bed.

Two witnesses, sisters, testified that on the afternoon of the Sunday in question they had been to a church building in the city, in order to have a picture of a confirmation class taken, and of which one of them was a member. One was 17 and the other 11 years of age. They stated that after leaving the church, which was some distance from their home, they walked home, and on the way they fell in behind a man on the sidewalk near the Dennison residence, who was carrying a suit case similar to the one in evidence, and, after walking near him for some distance, they turned off the walk and went to their home. They did not speak to him nor see his face, they having walked behind him, but they thought they subsequently recognized Erdman as the man. As we have seen, the suit case was discovered upon Mr. Dennison's porch ten minutes before three. No one was seen at or near the suit case, which had been left there a short time before its discovery. Some little time, at least, had been required to place it, for Mr. Dennison testified that the screw-eye was so firmly screwed into the floor that it was necessary to use a claw-hammer in unscrewing it. At least ten minutes were required for the girls to walk from the church to where they followed the man with the suit case. The picture of the class was taken on the front steps of the church. The photograph was introduced in evidence, and the elder of the two sisters was clearly identified in the picture. On the photograph is shown a shadow of the eaves of a building cast upon the side of the church. There was a difference of opinion as to just when the picture was taken, no one of the parties present being able to more than estimate or approximate the time, and, as expressed by some, "guess" at it. The professor of astronomy of the Creighton University made a careful calculation as to just what time the shadow was cast on the place shown in the photograph, and it was found to be 21 minutes and 12 seconds after 3 o'clock, which was after the discovery of the suit case on the porch. We must also add the time required to make such preparation

for departure from the church as girls of that age usually take, and the time occupied in the walk referred to. It thus appears that the person seen by the girls was not the one who placed the suit case upon the porch.

We find it impossible to review all the evidence submitted to the jury without extending this opinion to an unreasonable length, and, as the cause will probably be tried again, it would be improper for us to do so, but these suggestions are made as calling attention to what seem to us to be more or less vital questions involved. There was testimony to the effect that plaintiff in error had made threats against Mr. Dennison, claiming that Dennison had been the cause of serious losses to him. These were proper to be considered, but Mr. Dennison testified that he had never had any dealings or transactions with Erdman at any time.

The papers or wrappers around the "sticks" of the contents of the suit case were of the brand of a known manufacturer, the sticks being of a shape different from others and peculiar to the product of that factory, although not unknown to the trade. The stone quarries at Louisville, in Cass county, were visited by detectives, and it was found that the dynamite in use there was of 'the make or brand referred to. It was also shown that one of the depositories of dynamite was some distance from the city of Louisville, and was not protected by being locked in the place of deposit. A short time before the Sunday on which the crime is alleged to have been committed, plaintiff in error was seen in Louisville, but the state offered no evidence that he was seen near where the dynamite of the quarrying company was kept, nor that any portion of the dynamite had been missed or removed therefrom. We must confess we are at a loss to see the materiality of that evidence. There is no shadow of proof that plaintiff in error was in Louisville for any improper or unlawful purpose, nor that he even knew of the location of the unprotected dynamite. Of a similar nature was the testimony of a trunk dealer in Omaha, who testified that

prior to the 22d day of May, 1910, he had two suit cases of the same kind as the one introduced in evidence; that after that date he was visited by detectives for the state, when but one was found in stock; that he had not sold the other himself, and had no record of it having been sold; that he had clerks and employees whose business it was to sell his goods, none of whom were called to testify. There was no proof that plaintiff in error had been seen at the store, nor of any fact which could by any course of reasoning lead to the conclusion that he had in any way procured the suit case claimed to have been missing. Nothing could possibly result from this evidence, unless it might be to raise a suspicion without proof that plaintiff in error may have stolen the dynamite from the quarries at Louisville, and have purloined the missing suit case from the store. That the evidence was too remote, and, as offered, wholly immaterial, must, we think, be conceded.

Miss Alma Stuft was called by the state as a witness on rebuttal. She was a member of the class of girls whose pictures were taken on Sunday, May 22. She was not called as a witness in chief by the state. The subject presented to her was as to the time when the pictures were taken. As with others upon the same subject, she was uncertain as to the exact time, but gave her judgment, which fixed it later than what was claimed by the state. She was asked by the county attorney if she had not given a written statement to the city detective who called upon her. She answered that she had, but upon more mature reflection she was satisfied she had made a mistake in time, whereupon the county attorney proceeded to read to her, in the presence of the jury, certain extracts from the statement prepared by the detective in her presence. We copy the following: "Q. Did you make a statement and sign a statement about this? A. Yes, sir; I did. Q. I will ask you to look at this paper and state if that is the statement you made." After some discussion, followed by a ruling in favor of the state, but without an

answer, she was asked: "You identify this as the state-ment? A. Yes, sir. Q. And it is correct, is it? A. Yes, sir. Q. You read that, and signed it? A. Yes, sir." After further objections by the defense, and the rulings of the court thereon, the county attorney proceeded: "But in this statement was this (reading from state-ment): 'We had four pictures taken altogether of the confirmation class, and the preacher was in the first pic-ture which was taken by Otto Timme.' What do you say about that? A. I don't remember just exactly if he was in the first picture, or not; I think he was in the second picture. Q. This is the statement you made at that time, is it not?" (Not answered.) "Q. Then do you say the preacher left after the first picture was taken; that was shortly after 2 o'clock?" (Not answered.) "Q. What do you say about that? A. I think the preacher left after the second picture was taken. Q. And you say (read-ing), 'The Hageleit girls left after the second picture was taken, which was not later than 2:30 P. M.' What do you say to that? A. Yes; I know the Hageleit girls left after the second picture was taken. Q. Then you say (read-ing), 'We had two other pictures taken after 2:30 P. M.' What do you say about that? A. Well, I do not know just exactly what time it was, but I know they left after the second picture was taken—the Hageleit girls. Q. (read-ing) 'I know they were all completed before 3 o'clock.' A. Well, I don't know. Q. Didn't you say this a month ago? A. Yes, sir. Q. Well, is that true?" (No answer.)

There is no suggestion that this witness is unfriendly. She simply stated that upon more "serious" reflection, after making the statement, she had been mistaken. She was not called by the defense, but was the state's witness. Objections were made and overruled at every point in this examination. By this action on the part of the county attorney he succeeded in getting before the jury the *ex parte* statement made by the witness to the detective in contradiction of her testimony while being examined by him. We know of no rule of evidence which will permit

this. It is the same in principle as the course pursued in *Masourides v. State,* 86 Neb. 105, and which was condemned in that case, and in which we said: "A moment's reflection must show the fallacy of the contention of the state and ruling of the court upon this question. The necessary effect of the course pursued must have been either to discredit and, to that extent, destroy the credibility of the state's own witness, or to substitute for her evidence the former statements alleged to have been made by her." While the whole of the paper was not read to the jury, as in the *Masourides* case, yet, to the extent pursued, the vice was the same.

A reporter for the Omaha Bee was called as a witness on the part of the defense. After testifying that he was present at the time of the examination of the contents of the suit case, he was asked as to how many cartridges were in the pistol found in the suit case. His answer was, in substance, that it was impossible for him to remember the details of what he saw in making that examination; that he wrote out what he had seen and furnished it to the paper for publication; that his writing was accurately published, but the original manuscript was not kept; that he could refresh his memory from the published article and testify to what he saw in the examination made, but that he could not otherwise do so, having no present recollection of the matter suggested by the inquiry. The court, upon objection, refused to allow the evidence, holding that the witness could refresh his memory only from the original memorandum. In *Topham v. M'Gregor,* 1 Car. & Kir. (Eng.) 320, the writer of articles in a newspaper testified that all the articles written by him were true, and it was held that the newspaper containing the article under consideration might be placed in his hands for the purpose of refreshing his memory, and that he might be asked whether, looking at the articles, he had any doubt that the fact was as therein stated. See, also, *Hawes v. State,* 88 Ala. 37; *Clifford v. Drake,* 110 Ill. 135; *Commonwealth v. Ford,* 130 Mass. 64; *Jackson v. State,* 66

Miss. 89; 1 Wigmore, Evidence, sec. 760; Jones, Evidence
(2d ed.) p. 1122 *et seq.;* 3 Russell, Law of Crimes (7th
Eng. ed.) p. 2303.

A number of questions, arising upon the impaneling of
the jury, as well as those upon and during the trial, are
presented, but as the law of this state is well settled upon
most, if not all, of them, and they may not occur in the
further proceedings of this case, they will not be noticed.
It is insisted that, under the statutes of this state, the
facts stated in the information do not constitute a crime,
but counsel have not seen proper to brief the law on that
subject, and we need not discuss it.

The judgment of the district court is reversed and the
cause is remanded for further proceedings.

                                          REVERSED.

BARNES, J., dissenting.

I am unable to concur in the conclusion of my asso-
ciates. By the majority opinion it is held, as one of the
grounds for reversing the judgment of the district court,
that it was reversible error to submit to the jury the testi-
mony by which it was sought to connect the defendant with
the dynamite contained in the suit case which was placed
on the porch of the Dennison home. It was shown by the
testimony that the dynamite in question was contained
in a particular kind of wrapping which was used only by
the firm that manufactured that kind of explosive; that
the only place in the vicinity of Omaha where that kind
of dynamite was being used was in a certain quarry at the
near-by town of Louisville; that a quantity of that brand
of dynamite was stored there in a place accessible to any
one who might for any reason desire to obtain it. It was
also shown that, a day or two before the suit case was
placed on the Dennison porch, the defendant was seen at
Louisville, near the place where the dynamite was stored,
and his presence there was wholly unexplained. Now the
state had introduced testimony tending to show that the
defendant was seen with a suit case like the one in ques-

tion at or near the Dennison home, at or about the time
the suit case which contained this same brand of dyna-
mite was discovered upon the Dennison porch. It was
therefore proper for the jury to consider the circum-
stances above described, with all of the other evidence, as
tending to establish the defendant's guilt. In this case,
as in all other crimes of this nature, the·prosecution is
compelled to rely upon circumstantial evidence, and it
should be remembered that a dynamiter does not go into
the open market to procure his explosives, but, in order to
avoid detection, is compelled to procure them in the most
secret and surreptitious manner. Therefore, the state
was entitled to the benefit of every circumstance which
tended in any way, however remote, to aid the jury in
determining the guilt or innocence of the defendant. The
probative force of this evidence was a question for the
jury alone, and not one to be determined, declared or
commented on by a court of review.

The majority, as another reason for reversing the judg-
ment of the district court, hold that it was error to re-
ceive the evidence of the trunk dealer of the city of
Omaha that just previous to the time the suit case in
question was placed on the Dennison porch he had two
suit cases in stock similar to the one found at the Denni-
son home, that he missed one of them, and that neither
he nor his clerks had sold it, so far as he knew. It is said
that this evidence was immaterial and irrelevant, and
was prejudicial to the accused.

It should be remembered that one contemplating the
commission of the crime of dynamiting the home of an-
other would necessarily observe the same secrecy in ob-
taining a suit case, or other receptacle in which to inclose
his infernal machine, as he would in obtaining the ex-
plosive with which to charge it, and when it was shown
that defendant was seen at or near the Dennison home
with a suit case like the one in question, and which may
have been the one which the dealer missed from his stock,
it would seem that this circumstance was properly given

to the jury to aid them in correctly solving the main question under consideration.

The third ground on which the reversal is predicated is that the court erred in allowing the county attorney in the examination of a witness to read to her excerpts from her former written statement, in order to refresh her recollection. The contents of the written statement was neither read to her in the presence of the jury, nor was the jury permitted to examine it. In other words, it was not offered or received in evidence. I am of opinion that this was not reversible error, but was in all respects in accordance with the correct practice and the well-established rule that a memorandum or written statement made by a witness may be used to refresh his recollection. I am unable to see how this was in any way prejudicial to the rights of the defendant.

The fourth reason for the reversal is that the court erred in not permitting the Omaha Bee reporter to use or read an article published in that newspaper to refresh his recollection of what he saw at the time the suit case in question was examined. As I read the record, this witness testified that he could not recollect what he saw or just what transpired at the time the suit case was opened; that he wrote an account of the matter at the time, which was published in his newspaper; that what he wrote was correctly published; that he had lost his original notes taken at the time, but he failed to state that what he wrote was the truth of the matter, and therefore it would seem that the court properly refused to allow him to testify from the published article, because this was secondary evidence which was not clearly shown to reflect the truth of the transaction in question. Again, this ruling could not have resulted in any prejudice to the accused, for the transaction was treated by the witness as so wholly inconsequential that the facts there disclosed made no lasting impression on his mind.

Finally, and in concluding this dissent, I feel constrained to protest against so much of the majority

opinion as discredits the probative force of the evidence produced by the state, and which seems to indicate that it was insufficient to sustain the verdict of the jury. I do this because the case is remanded for further proceedings, and the opinion will make another conviction impossible. We should not thus destroy the power of those charged with the duty of enforcing our criminal laws to properly perform that duty. It would seem that the main question for this court to determine in cases like the one at bar is, has the defendant been accorded a fair trial? Upon that question, an examination of the record satisfies me that the defendant was not only accorded that right, but was given an unusual latitude in presenting his defense. The jury found him guilty, and I am persuaded that the evidence sustains the verdict. In such cases a reviewing court should not reverse the judgment for trivial causes, or technical errors.

For the foregoing reasons, I am of opinion that the judgment of the district court should be affirmed.

FAWCETT, J., concurs in this dissent.